NEW YORK OYER AND TERMINER.  February, 1860.  Before *Ingraham*,
Justice of the Supreme Court.

## THE PEOPLE *v.* MORTIMER SHAY.

On a motion for a new trial made before the Oyer and Terminer, after a
conviction for murder, on the ground that the verdict was against evidence,
the following facts appeared: The deceased and one Smith were quarrelling,
when the prisoner interfered and struck the deceased the first blow on the
head; the blow was returned by the deceased, who then retreated, followed by
the prisoner. The prisoner secretly opened his knife, whereupon the deceased
again struck at the prisoner, and again retreated. The prisoner then struck
the deceased with the knife, and cut him in the face. The deceased continued
to flee, and the prisoner was approaching the deceased, when Kirby ran in
between them. The prisoner then struck at Kirby with the knife, but the
latter jumped out of the way, and the prisoner followed the deceased. One
of the brothers of the deceased called out to him to take care or he would be
killed, and as the deceased looked around to see his danger, the prisoner struck
the knife into his temple with such force, that after three unsuccessful attempts
to draw it out, he fled, leaving the knife sticking in the head of the deceased.
The death of the deceased was caused by the last blow. It was *held* that these
facts were sufficient to warrant the conclusion that the prisoner had formed
the determination to take the life of the deceased before he struck the last blow,
and a new trial was denied.

ON the 2d day of February, 1860, the defendant was con-
victed in this court of the murder of one John Leary. A
motion was made for a new trial, on the ground that the ver-
dict was against evidence. The facts sufficiently appear in the
opinion of the court.

*Henry L. Clinton*, for the defendant, made the following
points:

I. This court possesses the power to grant new trials upon the
merits. (*People* v. *Stone*, 5 *Wend.*, 39; *People* v. *Morrison*, 1
*Park. Cr. R.*, 625; *People* v. *Carnel*, 1 *Park. Cr. R.*, 256; *Peo-
ple* v. *Court of Sessions of Wayne County*, 1 *Park. Cr. R.*,
370.)

II. The verdict in this case is contrary to law, and overwhelmingly against evidence.

From the undisputed facts in the case, and on the testimony for the prosecution, taking it in its worst phase against the prisoner, no more than a case of manslaughter was proven. The death of the deceased occurred in a sudden affray, the prisoner and deceased having exchanged blows before any knife was used by the prisoner; there being no evidence of any old grudge or ill-feeling on the part of prisoner towards deceased prior to this sudden combat.

It appears from all the evidence in the case, that during the affray no one except the deceased used any violence upon the prisoner. The latter was stabbed during the affray, and it was observed by the officer when he got him to the station house, that he was bleeding from behind the ear. That he had been cut there appears from the testimony of Spencer, Ellen Connolly and officer Sherlock. It appears from the whole evidence of the prosecution, that no blow was struck by prisoner or deceased after the former had inflicted the fatal stab upon the latter. This being so, it follows inevitably that the deceased previously *cut* the prisoner.

Even had the deceased stabbed the prisoner after he (deceased) had received the fatal blow, this would demonstrate that the deceased had a knife upon that occasion, with which he fought the prisoner. He must have had it open and used it before, for it is not at all probable that after he himself had been fatally stabbed, and the knife stuck in his temple, he could coolly take out his own knife, open it, pursue the prisoner and stab him.

Upon the facts appearing in the evidence, the law clearly and unmistakably fixes the offence as no more than manslaughter. From those facts the law presumes the absence of premeditated design or malice aforethought, and it has been so adjudged, repeatedly and uniformly.

Whether certain facts amount to a sufficient provocation to reduce the crime of killing from murder to manslaughter, is a question of law. (*State* v. *Craton*, 6 *Iredell*, 164.)

What is a sufficient provocation to make that which would otherwise be murder, a less offence, is a question of law. (*State* v. *Durno*, 18 *Miss.*; 3 *Bennett*, 419.)

The fact that the prisoner interfered in the quarrel or fight between the deceased and Smith, makes no difference, so far as the question of manslaughter is concerned:

" And of the like offence [manslaughter] shall he be adjudged guilty, who, seeing two persons fighting together in a private quarrel, whether sudden or malicious, take part with one of them and kills the other." (1 *Hawk. Pl. C.*, *ch.* 31, 125.)

" Where the third party interferes from hot blood alone, and kills one of the combatants, this is mere manslaughter." (*Whar. on Hom.*, 211.)

" A party of men were playing at bowls, when two of them fell out and quarrelled, and a third man, who had not any quarrel, in revenge of his friend struck the other with a bowl, of which blow he died; and this was held manslaughter, because it happened on a sudden motion in revenge of his friend." (*Whar. on Hom.*, 202.)

It is not important, in the legal aspects of the case, whether prisoner struck the first blow.

In 1 *East's Pl. Crown*, 241, the author says: "But there is another class of cases where the degree or species of provocation enters not so deeply into the merits of them as in the foregoing. And those are, where, upon words of reproach, or indeed upon any other sudden provocation, the parties came to blows, and a combat ensues, no undue advantage being taken or sought on either side, if death ensue, this amounts to manslaughter. And here it matters not what the cause be, whether real or imagined, *or who draws or strikes first.*"

In *Foster's Crown Law*, 295, the author observes: " A. useth provoking language or behavior towards B.; B. striketh him, upon which a combat ensueth, in which A. is killed. This is holden to be manslaughter, for it was a sudden affray, and they fought upon equal terms; and *in such combats upon sudden quarrels, it mattereth not who gave the first blow.*"

From the fact that the prisoner used a deadly weapon, the law raises no presumption in favor of murder and against manslaughter.

In 1 *East's Pl. Crown*, 238, it is said: "And it has been shown that in the case of a legal provocation, strictly so considered, this heat will extenuate the guilt of the party acting under its adequate influence, *even though he made use of a deadly weapon.*"

If two fight with deadly weapons in a mutual combat, begun in hot blood, and death ensue, it is manslaughter. (*United States* v. *Mingo*, 2 *Curtis C. C.*, 1.)

If the deceased assail the prisoner with insulting words and blows, and without the use of any weapon, and the prisoner, without attempting to evade the fight, killed deceased with a deadly weapon, he is guilty of manslaughter. (*Atkins* v. *State*, 16 *Ark.*, 568.)

"Any assault in general, made with violence or circumstances of indignity upon a man's person, if it be resented immediately by the death of the aggressor, and it appear that the party acted in the heat of blood upon that provocation, will reduce the crime to manslaughter; and the same rule would apply, says Lord Hale, if, when A. and B. were riding on the road, B. had whipped A's horse out of the track, and then A. had alighted and killed B." (*Wharton's Law of Homicide*, 186.)

Where the defendant, having been violently beaten and abused, made his escape, ran to his house eighty yards off, got a knife, ran back, and on meeting with the deceased, stabbed him, it was held but manslaughter; but it was said that if, on the second meeting, the defendant had disguised the fact of having a weapon for the purpose of inducing the deceased to come within his reach, it would have been murder, such concealment affording ground for the presumption of deliberation. (*State* v. *Norris*, 1 *Hay.*, 429.)

Where, in New York, the prisoners, three women, each of them armed with clubs, had fallen into a quarrel with the deceased, who was also armed with a club, and had been chased by him for some distance till he stopped, upon which

one of them turned round and gave him a mortal blow, it was held manslaughter. The indulgence which the law extends to cases of this description, is founded on the supposition that a state of sudden and violent exasperation is generated in the affray, so as to produce a temporary suspension of reason, and that the transport of passion excludes the presumption of malice. (*People* v. *Garretson, et al,* 2 *Wheeler's C. C.,* 347 ; *U. S.* v. *Thayer, U. S. Cir. Court,* 2 *Wheeler's C. C.,* 503.)

No words or gestures, however irritating, will justify a killing, although they may reduce the offence from murder to manslaughter. (*U. S.* v. *Wittberger,* 3 *Wash. C. C.,* 515.)

Where a person, on being struck a heavy blow with the fist, a moment after stabbed his assailant with a deadly weapon, it was held that if death had ensued, it would have been manslaughter only. (*The State* v. *Yarbrough,* 1 *Hawks.,* 78 ; *The State* v. *Jackett,* 1 *Hawks.,* 210.)

\* The law does not put an act done upon a sudden impulse, and in the heat of passion, on the same footing, in regard to guilt, with a deed deliberately performed. This indulgence proceeds on the supposition that the reason or judgment of the party perpetrating the act has been temporarily suspended or overthrown by the sudden access of violent passion. (*Preston* v. *The State,* 25 *Miss.,* 383.)

If a party committing a homicide acted under very great provocation, and if all the circumstances of the killing show that it was from a sudden, violent heat of passion, occasioned by such provocation, and not from the promptings of an abandoned and malignant heart, although there was no assault first made upon him by the person killed, it will be a case of voluntary manslaughter. (*Stokes* v. *State,* 18 *Geo.,* 17.)

If the deceased assailed the prisoner with insulting words and blows, and without the use of any weapon, and the prisoner, without attempting to evade the fight, killed deceased with a deadly weapon, he is guilty of manslaughter. (*Atkins* v. *State,* 16 *Ark.,* 568.)

A., the son of B., and C., the son of D., fall out in the field and fight. A. is beaten, and runs home to his father all bloody.

The People *v.* Shay.

B. presently takes a staff, runs into the field, being three-quarters of a mile distant, and strikes C. that he dies. This is not murder in B., because done in a sudden heat and passion. (1 *Hale*, 453.)

If A. and B. fall suddenly out, and they presently agree to fight in the field, and run and fetch their weapons, and go into the field and fight, and A. kills B., this is not murder, but homicide, for it is but a continuance of the sudden falling out, and the blood was never cooled; but if there were deliberation, as that they meet the next day, nay, though it were the same day, if there were such a competent distance of time that in common presumption they had time of deliberation, then it is murder. (1 *Hale*, 453.)

If a person upon meeting his adversary unexpectedly, who had intercepted him on his lawful road, and in his lawful pursuit, accepts the fight, when he might have avoided it by passing on, the provocation being sudden and unexpected, the law will not presume the killing to have been upon the ancient grudge, but upon the insult given by stopping him on the way, and it would be manslaughter. (*Copeland* v. *State*, 7 *Humph.*, 479.)

If two fight with deadly weapons in a mutual combat, begun in hot blood, and death ensue, it is manslaughter. (*U. S.* v. *Mingo*, 2 *Curtis C. C.*, 1.)

A. presented a gun at B., and subsequently took it down. B. then said that if he raised it again he would throw a brickbat at him. He did again raise it, the brickbat was thrown, and B. was shot. Held, that in consideration of the threat or banter of B., such killing may have been no more than voluntary manslaughter, and that it was error in the court below to charge that "if the first presenting of the gun was with malicious intent, notwithstanding what followed, the killing was murder." (*McGuffie* v. *State*, 17 *Geo.*, 497.)

But, though words of slighting, disdain or contumely, will not of themselves make such a provocation as to lessen the crime into manslaughter, yet it seems that if A. give indecent language to B., and B. thereupon strike A., but not mortally,

and then A. strike B. again, and then B. kill A., that this is but manslaughter. The stroke by A. was deemed a new provocation, and the conflict a sudden falling out; and on these grounds the killing was considered only manslaughter. (1 *Hale*, 455.)

In the case of *R.* v. *Hayward* (6 *Car. & P.*, 157), it was held that if, in a case of stabbing, the jury are of opinion that the wound was given by the prisoner while smarting under a *provocation so recent and so strong*, that the prisoner might be considered as not being at the moment *master of his own understanding*, the offence will be manslaughter.

"In a leading case in England, three Scotch soldiers were drinking together in a public house. Some strangers in another box abused the Scotch nation, and used several provoking expressions towards the soldiers, on which one of them, the prisoner, struck one of the strangers with a small rattan cane, not bigger than a man's little finger. The stranger went out for assistance, and in the meantime an altercation ensued between the prisoner and the deceased, who then came into the room, and who, on the prisoner's offering to go without paying his reckoning, laid hold of him by the collar, and threw him against a settle. The altercation increased, and when the soldier had paid the reckoning, the deceased again collared him and shoved him from the room into the passage. Upon this the soldier exclaimed that he did not mind killing an Englishman more than eating a mess of crowdy. The deceased, assisted by another person, then violently pushed the soldier out of the house, whereupon the latter immediately turned round, drew his sword, and stabbed the deceased to the heart. It was adjudged manslaughter." (*Wharton's Crim. Law*, 4th Rev. Ed., § 989.)

If one detect another in the act of adultery with his wife, and instantly kills him, the offence will be but manslaughter.

From all the authorities, it is clear that where death ensues from a sudden affray, there being no evidence of any antecedent grudge, although a deadly weapon be used, the law presumes the absence of malice or a "premeditated design to

The People *v.* Shay.

kill," and that the offence committed is no more than manslaughter. Upon this ground, the defendant is entitled to a new trial.

*Nelson J. Waterbury* (District Attorney), on behalf of the People, contended that the verdict was fully sustained by the the evidence.

*By the Court,* INGRAHAM, J. . The counsel for the prisoner moves for a new trial, on the ground that the verdict is against evidence, and that the facts proven only warranted a conviction for manslaughter. Upon the trial of the cause, the jury were fully instructed as to the distinction between murder and manslaughter, and they were also told in what cases the killing of the deceased could be justified or excused. To the charge no exceptions whatever were taken, and the jury was also charged as requested by the prisoner's counsel on all these points. There can be, therefore, no ground for asking a new trial for errors of law in the judge's charge. The only question, therefore, proper for me to consider upon this motion is, whether the facts as proven will sustain the verdict finding the prisoner guilty of murder. I feel very much at a loss to draw any distinction between this case and that of *Shorter* (2 *Comst.,* 193). In that case the parties engaged in a sudden affray in the street. No one interfered. After several blows, the deceased discovered that Shorter had a knife, and retreated. The prisoner followed him, and blows passed between them until he got to the middle of the road, when the deceased fell and died. There was no positive evidence of blows by the prisoner with the knife; but upon evidence that the prisoner carried a knife, and that the deceased had several wounds on his body, given by a knife, the prisoner was convicted of murder, and that conviction was sustained. In the present case, the evidence against Shay is of a more positive character, and if the case of Shorter was one justifying a charge of murder, there can be no doubt but that the facts in this case would warrant a similar verdict. The deceased and one Smith were quarreling

and Shay interfered. He struck the deceased the first blow on the head; this blow was returned by the deceased, who then retreated, followed by Shay. Shay secretly opened his knife, which led the deceased again to strike at Shay, and again to retreat. There is evidence that the deceased at that time had nothing in his hand, and some evidence from Corbel that he had a knife. The latter evidence, both from the character and the appearance of the witness, I think the jury might have very properly refused to believe. The question of fact arising thereon was left to the jury. After this Shay struck at the deceased with a knife, and cut him in the face with it. The deceased continued to flee, and Shay was approaching the deceased when Kirby ran in between them. The prisoner struck at Kirby with the knife, who jumped out of the way, and the prisoner then followed the deceased. One of his brothers called out to him to take care, or he would be killed, and as the deceased looked around to see his danger, the prisoner struck the knife into his temple with such force as to render it so fast there that with three attempts to pull it out made by the prisoner, he was unable to do it, and he then fled, leaving the knife sticking in the head of the deceased. Under these facts the question was submitted to the jury, whether the prisoner, before striking the last blow, had formed the determination to take the life of the deceased? The facts, in my judgment, were fully sufficient to warrant said conclusion. He was the aggressor. He used a knife when the deceased had none; he opened the knife secretly. After the blow he gave had been returned, he pursued the deceased; he threatened and attempted to stab Kirby who interfered; he again pursued the deceased while running, and he struck such a blow as no one would have struck in such a place if he had not determined to take life. In Shorter's case, the Court of Appeals held, that under such a state of facts, the question whether the homicide was justifiable or not, could not arise, and there was no color even for submitting that question to the jury, and that where the proper instructions were given to the jury between murder and manslaughter, and the jury found the prisoner guilty of

murder, the judgment should be affirmed. In *The People* v. *Clark* (3 *Seld.*, 394), which was a case similar to this in the interference between others who were engaged in a conflict, the court say, "If there be sufficient deliberation to form design to take life, and to put that design into execution by destroying life, there is sufficient deliberation to constitute murder, no matter whether the design be formed at the instant of striking the fatal blow, or whether it be contemplated for months. It is enough that the intention precedes the act, although that follows instantly." So also in *The People* v. *Sullivan* (3 *Seld.*, 396).

Motion for new trial denied.

---

SUPREME COURT. New York General Term, February, 1860. *Sutherland, Allen* and *Bonney*, Justices.